**CENTURY ARMS, INC.**

v.

**David KENNEDY, Secretary of the Treasury.**

**Civ. A. No. 5929.**

United States District Court,
D. Vermont.

Feb. 26, 1971

McNamara, Fitzpatrick & Sylvester, Burlington, Vt., and Ginsburg, Feldman & Bress, Washington, D. C., for plaintiff.

Norman Cohen, Asst. U. S. Atty., George W. F. Cook, U. S. Atty., Rutland, Vt., for the Government.

## OPINION and ORDER

OAKES, District Judge.

From a hearing on the Government's motion to dismiss, and plaintiff's motion for summary judgment, it emerges that the facts in this case are not substantially in dispute.

Plaintiff, Century Arms, Inc., is a Vermont corporation engaged in the importation and sale of firearms for law enforcement and sporting purposes. Be-

tween June of 1967 and August of 1968, Century Arms negotiated contracts with police departments and military branches of several foreign governments for the importation of $343,192.04 of surplus military rifles suitable for sporting purposes.

Between July of 1967 and September of 1968, Century applied to the Office of Munitions Control of the State Department for licenses to import the firearms, as required by regulations issued under the Mutual Security Act of 1954 § 414, 22 U.S.C. § 1934 (Supp. V, 1969) amending 22 U.S.C. § 1934 (1964). Between August 16, 1968, and October 8, 1968, valid licenses were issued to Century, duly signed by authorized officers of the Department of State. Although printed "Form DSP–38," on which the licenses were issued, contains the statement "License valid for six months from above date" [date of issuance], each of the licenses granted to Century had stamped in bold letters across its face "License Not Valid After December 15, 1968." This stamped modification concededly superseded the six months' limit in the printed form. December 15, 1968, was the day before the Omnibus Crime Control and Safe Streets Act of June 19, 1968, Pub.L. No. 90–351, § 907, 82 Stat. 197 (hereinafter called the Crime Control Act [1]), was to take effect.

Upon receipt of the licenses, and before their December 15 expiration, Century took steps to insure the arrival of the firearms in this country. The first shipment reached the United States on October 21, 1968. The last was here by December 6, 1968. Thus the shipments were received in the United States before the licenses had expired.

The shipments were not, however, received before Congress had enacted the Gun Control Act of 1968, 18 U.S.C. §§ 921–925 (Supp. V, 1969) [2], on October 22, 1968. Sections 922(l) and 925(d) (3) of the Gun Control Act prohibit the importation of all surplus military firearms. Section 105(b) of the Gun Control Act provided that § 922(l) and § 925(d) (3), among others, were to take effect upon enactment, viz., October 22, 1968.

The genesis of this suit is the Secretary of the Treasury's refusal, after October 22, 1968, to allow Century to "import" the firearms covered by the licenses issued by the Office of Munitions Control. "Importation" is used here in a narrow sense, as the guns are physically in the United States, but are being held in bonded warehouses pending the outcome of this suit. When we speak of the Secretary's refusal to allow Century to "import" the guns, then, we mean refusal to allow Century to remove the guns from the warehouses and resell them to its customers.

Century contends that the Secretary of the Treasury misconstrued the Gun Control Act, as that Act was never intended to invalidate then-existing licenses. Furthermore, the argument runs, if the Secretary's construction of the Gun Control Act is proper, then that Act must be held unconstitutional in its application to Century as in violation of the Due Process and/or Just Compensation clauses of the Fifth Amendment. Century seeks declaratory relief against the interpretation of the Gun Control Act given by the Secretary, and relief in the nature of mandamus compelling the Secretary to grant the necessary licenses to Century.

The Government, on the other hand, seeks dismissal of the suit as an unconsented action against the sovereign, and for failure to state a claim upon which relief can be granted. The Government's argument in support of its motion to dismiss for lack of subject-matter jurisdiction is twofold: first, that

1. This bill is variously referred to as the "Omnibus Bill," the "Safe Streets Act" and by other designations. "Crime Control Act" has been selected here for simplicity.

2. Pub.L.No.90–618, 82 Stat. 1213 (hereinafter referred to as the Gun Control Act).

the Secretary's interpretation of the Gun Control Act is correct, that the Secretary is thus acting within the scope of his authority, and that the suit therefore is, in reality, against the sovereign; second, that the absence of constitutional infirmity in the Act itself leaves this court without jurisdiction. The Government's motion to dismiss for failure to state a claim upon which relief can be granted is similarly premised on the Government's reading of the Gun Control Act, which is consistent with the Secretary's reading of the Act.

In opposition to the defendant's motion to dismiss for lack of subject matter jurisdiction, the plaintiff relies on the line of cases highlighted by Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689–690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), which holds that an action in the nature of mandamus will lie against an officer of the federal government where (1) the officer acted beyond the scope of his delegated authority, or *ultra vires* as is sometimes said, or (2) the action of the federal official is unconstitutional, whether or not permitted by the statute in question. It is the plaintiff's contention that both of those conditions are here met, and that 28 U.S.C. § 1361 (1964) [3] therefore confers subject matter jurisdiction.

Whether or not one takes the view that 28 U.S.C. § 1361 merely enlarges the available venue in cases of so-called "non-statutory" judicial review but does not provide an independent source of federal jurisdiction, we think the question of subject-matter jurisdiction can be disposed of only after consideration of the merits. See Land v. Dollar, 330 U.S. 731, 739, 67 S.Ct. 1009, 91 L.Ed. 1209 (1949).

The traditional rationale (here relied upon by the Government) to divest the federal courts of subject matter jurisdiction in actions where mandamus is sought against a government official has

rested on the argument that if the official act sought to be compelled is ministerial only, mandamus will lie, but that if the act involves official discretion, then the suit must be dismissed, lest the federal courts begin directing an administrator in the exercise of his constitutionally-delegated discretion. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 166, 2 L.Ed. 60 (1803). *Larson, supra,* is of course the oft-cited authority for the proposition that when an administrator acts within his allowable discretion, he is in reality acting as the sovereign and is therefore not amenable to suit. 337 U.S. at 688, 69 S.Ct. 1457. The logical corollary to that proposition, as the Court went on to note in *Larson,* is that when an administrator acts outside the scope of his delegated authority, he is no longer performing the acts of the sovereign; he can then be sued in an individual capacity. 337 U.S. at 689, 69 S.Ct. 1457. And when the constitutionality of the administrative action is challenged, suit may be brought, for even the acts of the sovereign are circumscribed by the prohibitions of the constitution. 337 U.S. at 690, 69 S.Ct. 1457.

While it may be well to say that there is no jurisdiction to interfere with the lawful exercise of discretion, the basing of jurisdiction on the "ministerial-discretionary" distinction leaves the perimeters of administrative discretion undefined in the particular cases. See, e. g., Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L. Rev. 308, 331–36 (1967); and Jaffe, Judicial Control of Administrative Action 572 (1965). To define the permissible limits of an administrator's discretion is a peculiarly judicial function. Safir v. Gibson, 417 F.2d 972 (2d Cir. 1969). Mr. Justice Frankfurter apparently saw it as a necessary assumption of federal jurisdiction. In a vigorous dissent to *Larson, supra,* he argued that

---

3. 28 U.S.C. § 1361: The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

to decide whether the "authority is rightfully assumed is the exercise of jurisdiction, and must lead to the decision of the merits of the question." United States v. Lee, 106 U.S. 196, 219, 1 S.Ct. 240, 27 L.Ed. 171, 330 U.S. at 728, 69 S.Ct. at 1481 (dissenting opinion).

■ Furthermore, although neither party has raised the issue, it is at least arguable that the statute in question, the Gun Control Act of 1968, provides the plaintiff statutory judicial review. Section 923(d)(2) of 18 U.S.C. provides for appeal to a federal district court from the Secretary of the Treasury's denial of a manufacturer's or importer's license under the Act, specifically mentioning 28 U.S.C. § 1361. While Section 923(d)(2) was not in effect at the time this controversy arose [Pub.L. No. 90–618, § 105(a)], the Act as a whole clearly contemplates judicial review of the Secretary's decisions on license applications under the new law. If an analysis of the merits were to find the plaintiff bound by the provisions of the Gun Control Act as interpreted by the Secretary of the Treasury, it would seem a harsh result indeed to deny the plaintiff judicial review because § 923(d)(2) had not yet taken effect when the plaintiff was told it could not import these guns. We are also aware that the grant of judicial review of agency action under one section of a federal regulatory scheme does not necessarily foreclose review of action under other sections. See Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

Accordingly, we think, as did Mr. Justice Frankfurter, that the jurisdictional issue necessitates a preliminary consideration of the merits.

The question first to be decided, of course, is the proper construction of the Gun Control Act of 1968. If the Secre-

tary were mistaken in his reading of the statute, then the constitutional issue would not be reached. The question cannot be decided without close scrutiny of the particular provisions of the statute in question here, an examination of the statutory scheme as a whole, with particular attention to the interests it was designed to protect or the evils it was designed to eliminate, and a look at the history of the legislation.[4]

The Gun Control Act of 1968 grew out of and was enacted as a series of amendments to the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351. Title IV of the Crime Control Act—State Firearms Control Assistance—was the first of two major attempts by the Congress (the second being the Gun Control Act) to assist the states in crime control through federal regulation of the "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce * * *." Pub.L. No. 90–351 § 901(a)(1). Among the major changes to be effectuated in the federal law by the Crime Control Act was a comprehensive scheme of licensing procedures for firearms manufacturers, importers and dealers, with administration and enforcement of the new provisions vested in the Secretary of the Treasury. Pub.L. No. 90–351, § 923.

Under federal law in effect prior to the Crime Control Act, licenses issued pursuant to the Federal Firearms Act, 15 U.S.C. §§ 901–909 (1964), could be obtained from the Secretary of the Treasury for $25 per year, and were a prerequisite to transporting, receiving or shipping firearms in interstate or foreign commerce. 15 U.S.C. §§ 902, 903 (1964).

In addition, importers like Century were subject to the provisions of the Mutual Security Act of 1954, 22 U.S.C. § 1934 (1964), and the regulations issued

---

4. See Learned Hand, The Contribution of an Independent Judiciary to Civilization (1944) in Dilliard, The Spirit of Liberty 172, 174: "Courts must reconstruct the past solution imaginatively in its setting and project the purposes which inspired it upon the concrete occasions which arise for their decision."

thereunder. Under the terms of the Mutual Security Act, the President of the United States is given the authority "to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms * * *." 22 U.S.C. § 1934(a) (1964). Regulations issued under the Mutual Security Act required importers of firearms to obtain a license for each shipment of imported firearms from the Office of Munitions Control of the Department of State, the President's delegate. The Office of Munitions Control issued its licenses on the DSP–38 forms mentioned above. The surplus military firearms in question could not legally have been brought into the United States without such a license. 22 C. F.R. 121–27.

The proven ineffectiveness of existing licensing procedures apparently prompted the enactment of Title IV of the Crime Control Act, for

> such firearms [other than rifles or shotguns] have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior. Pub.L. No. 90–351, § 901(a) (6).

Further, the inadequacy of licensing fees under the Federal Firearms Act and the application of improper standards to requests for licenses had "led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system." Pub.L. No. 90–351, § 901(a) (9). Congress had found that manufacturers' and dealers' licenses were being issued much too cavalierly under the Federal Firearms Act, and consequently set out more rigid standards for the grant of a license in Section 923 of the Crime Control Act.

Title IV of the Omnibus Crime Control Act specifically exempted from the applicability of its provisions traffic in so-called "long guns," that is, rifles and shotguns, or guns particularly suitable for sporting purposes. The statute,

Pub.L. No. 90–351, provides, in relevant part, that

> It shall be unlawful for any person knowingly to import or bring into the United States * * * any firearm or ammunition, except as provided in subsection (d) of section 925 of this chapter * * *." § 922(j).

Section 925(d) provides that

> The Secretary [of the Treasury] may authorize a firearm to be imported or brought into the United States * * * if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—
>
> (3) * * * is generally recognized as particularly suitable for or readily adaptable to sporting purposes, and in the case of surplus military firearms is a rifle or a shotgun * * *.

Section 907 of the Crime Control Act provided that

> The amendments made by this title shall become effective one hundred and eighty days after the date of its enactment; except that repeal of the Federal Firearms Act shall not in itself terminate any valid license issued pursuant to that Act and any such license shall be deemed valid until it shall expire according to its terms unless it be sooner revoked or terminated pursuant to applicable provisions of law.

With respect to the importation of surplus military rifles and shotguns, then, the Omnibus Crime Control Act would allow essentially the same guns to be imported as the cumulative provisions of the Federal Firearms Act and the Mutual Security Act had; fees would be greater, however, and more stringent standards of eligibility would apply, for an importer's license. A dealer like Century would have to obtain a basic importer's license, and then with each shipment of guns from abroad would have to establish to the satisfaction of the Secretary of the Treasury that the guns were suitable for sporting purposes, and in the case of surplus mili-

tary firearms from other countries, were not handguns. No surplus military handguns at all were to be imported after the Crime Control Act took effect, but the Secretary could approve the importation of surplus military rifles and shotguns.

Although it is not entirely clear whether the authority of the Office of Munitions Control to regulate the importation of firearms was to cease on the effective date of the Crime Control Act, it would be logical to infer that while the Secretary of the Treasury was to have primary responsibility for the approval of imports, the Office of Munitions Control would be able to issue cumulative regulations when necessary to further "world peace and the security and foreign policy of the United States." In fact, one of the objections to the Crime Control Act raised by those members of the Senate Judiciary Committee who dissented from the majority report on Title IV was the overlap between proposed Title IV and the existing regulations of the State Department. Expressing concern over the possibility that enactment of Title IV would allow interference with United States treaty obligations, the dissenters voiced the fear that

> * * * [i]mport restrictions considered by the committee would require the Treasury Department to overlap a State Department import licensing system authorized by section 414 of the Mutual Security Act, as amended, which is working well and makes full use of the overseas investigatory facilities of the State Department. [Individual views of Messrs. Dirksen, Hruska, Thurmond and Burdick on Title IV, S.Rep. No. 1097, 90th Cong., 2d Sess., reported at 1968 U.S.Code Cong. & Admin.News pp. 2112, 2306.]

The Office of Munitions Control itself must have foreseen some administrative difficulty or overlap between existing regulations and the provisions of Title IV. As Century's licenses indicate, that Office, after June 19, 1968, was stamping its licenses "Not Valid After December 15, 1968."

The envisaged administrative overlap was, however, never to materialize as anticipated, for the Crime Control Act had not yet taken effect when Congress passed the Gun Control Act of 1968. The Congressional web of gun regulation became more tangled.

Title IV of the Crime Control Act was aimed at the control of interstate traffic in concealable firearms. Even before President Johnson had signed it into law, however, work had begun in Congress to extend the prohibitions of Title IV to cover rifles and shotguns. Representative Celler had introduced H.R. 17735, in the House on June 10, 1968, and Senator Dodd had filed a comparable bill, S. 3633, on June 12, 1968. Both bills were in the form of proposed amendments to the Crime Control Act. Several alterations made in the bills before they were combined in conference committee and enacted as the Gun Control law of 1968 need to be mentioned here.

The Senate version of the proposed gun law, S. 3633, would have had an effective date of December 16, 1968, to correspond with the effective date of the Crime Control Act. Senator Dodd, however, subsequently urged an earlier effective date. On July 8, 1968, approximately three weeks after the Crime Control Act had been signed and while S. 3633 was before the Senate Judiciary Committee, of which Senator Dodd was a member, he told the Senate that

> * * * Title IV [of the Omnibus Bill] has, as it were, spurred on the importers to cash in on a 6-month effective date on those import controls. It appears that they intend to import just as many firearms as possible before December 15, 1968, the effective date of Title IV of the crime bill. It was certainly never my intention to create such a situation. I do not believe it was the intent of Congress either * * * I will therefore introduce an amendment at this time to Ti-

tle IV of the omnibus crime bill to make immediate the effective date of that act. * * * We did not pass the Omnibus Crime Control Act to give these gunrunners 6 months to flood the nation with foreign-made and military surplus firearms and to put more guns into the hands of criminals. 114 Cong.Rec. 20128–29 (1968).

When the proposed Gun Control law was reported by the Senate Judiciary Committee on September 6, 1968 (S.Rep. No. 1501, 90th Cong., 2d Sess.), the effective date of the provisions covering the importation of long guns and ammunition was August 1, 1968. The effective date for the rest of the bill was December 16, 1968.

In the meantime, a major change had been made in the proposed gun laws by the House of Representatives. H.R. 17735, as reported by the House Judiciary Committee, would have permitted the Secretary of the Treasury to permit the importation of surplus military rifles and shotguns suitable for sporting purposes. H.R.Rep. No. 1577, 90th Cong., 2d Sess. (June 21, 1968). On July 23, 1968, however, Representative Horton introduced an amendment to H. R. 17735 to prohibit the importation of all surplus military firearms, as an aid to federal control over the interstate shipment and mail order purchase of rifles and shotguns. Representative Horton told the House that

> long gun imports during the month of May alone were worth $388,000. I do not have to remind any member of this body that the late President Kennedy was killed with a $14 Italian military rifle. H.R. 17735 would effectively prevent the mail order of such a gun. Why should we not take the further step of preventing its importation? 114 Cong.Rec. 22779 (1968).

The Horton amendment was incorporated into H.R. 17735, which passed the House on July 24, 1968.

The House and Senate bills were subsequently submitted to a Conference Committee which reported favorably on H.R. 17735, with some modifications adopted from the Senate version of the enactment. Conference Rep. No. 1956, 90th Cong., 2d Sess. (October 9, 1968). The Horton amendment survived intact the revisions made by the Committee on Conference. The Committee did not, however, adopt the effective date of 180 days after enactment suggested by the House of Representatives. Instead, the Committee took from the Senate version an overall effective date of December 16, 1968, to correspond with the effective date of the Crime Control Act, and provided that the provisions relating to the importation of firearms and ammunition would take effect on the date of enactment. As amended in Conference, then, the Gun Control Act of 1968 was passed on October 22, 1968. On October 24, 1968, President Johnson issued Executive Order No. 11432. Section 2 of that order reads:

> All regulations issued and presently in effect pursuant to Section 414 of the Mutual Security Act of 1954, as amended, shall, insofar as they relate to control of the import of arms, ammunition and implements of war * * continue in effect and be administered by the Secretary of the Treasury until revoked or superseded by him. All pending applications for import licenses not acted upon by the Secretary of State at the date of this order shall be transferred to the Secretary of the Treasury for appropriate action. Exec. Order No. 11432, 33 F.R. 15701, 22 U.S.C.A. § 1934 note (1968).

The amendments to the Crime Control Act effectuated by the Gun Control Act which bear on the present dispute are several. Section 922(j) of the Crime Control Act was amended to deal with the transportation of stolen firearms. New section 922(*l*) of the Gun Control Act is essentially the same as 922(j) of the Crime Control Act. Section 922(*l*) provides that

> Except as provided in section 925(d) of this chapter, it shall be unlawful

for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition * * *.

Section 925 was amended to read:

(d) The Secretary [of the Treasury] may authorize a firearm * * * to be imported * * * if the person importing or bringing in the firearm * * * establishes to the satisfaction of the Secretary that the firearm * * *

(3) is * * * generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms.

And finally, the amendment to Pub.L. No. 90–351, § 105, which gives rise to this controversy, reads:

(b) The following sections of chapter 44 of title 18, United States Code, as amended by section 102 of this title shall take effect on the date of the enactment of this title: Sections 921, 922(l), 925(a) (1), and 925(d). Pub. L. No. 90–618, § 105(b).

Thus, the Secretary of the Treasury never received the authority given him in the Crime Control Act to issue licenses for the importation of surplus military shotguns and rifles. The Gun Control Act amended it away before the Crime Control Act took effect. The narrow question remains, however, whether the purpose of Congress, as that purpose is expressed in the terms of the Gun Control Act, was to put an immediate stop to the bringing into this country, or importation, of all surplus military firearms, or whether the purpose was to put an immediate stop to the issuance of licenses, leaving existing licenses to expire by their own terms.

■ Century Arms urges reading the word "authorize" in § 925(d) as a term of art, connoting the issuance of a license only. It is Century's argument that the immediate effective date of certain sections of the statute affected only the Secretary's power to issue licenses in the future, and left untouched his obligation to honor existing licenses. Construction of the statute in this fashion, however, would result in an anomalous state of affairs. Prior to December 16, 1968, the Secretary of the Treasury had no authority either to grant or deny a license to import surplus military long guns or hands guns (except, of course, his authority under the Federal Firearms Act to grant a manufacturer's license on payment of the statutory fee). The import licensing authority, as previously stated, was vested in the Office of Munitions Control under § 414 of the Mutual Security Act of 1954 and the regulations issued thereunder. If that authority were not vested in the Secretary, it would seem odd if Congress were to try to take it away from him. Nor does it seem likely that Congress, by the passage of § 105(b) (making § 925(d) effective upon enactment) intended to give the Secretary control over the issuance of licenses only for the additional period between October 22 and December 16 for the importation of guns adaptable for sporting purposes, including all surplus military long guns, while in the same breath any authority to issue licenses for the importation of any surplus military firearms was taken away. Such a construction would allow the Secretary to issue licenses between October 22 and December 16 for guns, other than surplus military firearms, particularly suitable or readily adaptable for sporting purposes. As the Secretary was to have that particular authority after December 16 in any event, along with his other duties, and as guns of that sort would still be importable after the effective date of the Crime Control Act, the Court cannot really believe that Congress intended such a strained construction of the Act, designed only to result in administrative confusion.

Furthermore, if Congress had wished only to stop the issuance of licenses for the importation of surplus military firearms between October 22 and December 16, rather than the importation itself, it might have left § 922(l), which makes it illegal to import firearms without the

Secretary's approval, to take effect with the rest of the Act on December 16. But Pub.L. No. 90–618, § 105(b), makes § 922(*l*), as well as § 925(d), effective immediately. Century's argument loses force when the provisions of the statute are read together. Section 922(*l*), which must be the starting point, effects an immediate ban on the importation or bringing into the country of all firearms. It says nothing about "authorizing" imports. Section 925—Relief from Disabilities—goes on to allow the Secretary to authorize an exemption for certain classes of imports. Century is, in effect, urging upon this Court a semantic distinction in which we are unwilling to indulge. We do not see the Secretary as assuming retroactive authority and revoking existing licenses, but rather as refusing to grant an exemption, which he had no authority to grant, to an existing prohibition—a course of action which concededly entailed a collateral effect on existing licenses.

The explanation by the managers on the part of the House of Representatives accompanying the Gun Control Act as amended by the Committee on Conference supports the view that a prohibition on imports, not just authorizations, was to take effect immediately. The Conference Report explains:

> Import controls. The House bill banned importation of all surplus military firearms, while the Senate version permitted importation of military surplus, rifles, and shotguns suitable for or readily adaptable to sporting purposes. The conference substitute contains the provision in the House bill.
>
> Effective Date. * * * The conference substitute conforms to the Senate amendment except that it provides that the restriction on imports of firearms and ammunition shall take effect on the date of the enactment of the bill. Conference Rep. No. 1956, 90th Cong., 2d Sess., reported at 114 Cong. Rec. 30568 at 30577 (1968).

Thus, even reading the word "authorize" in Section 925(d) as a term of art

meaning to issue a license, does not help Century, for § 922(*l*) makes the importation of surplus military firearms illegal, and § 105(b) makes § 922(*l*) effective immediately.

█ Century relies heavily on Exec. Order No. 11432, *supra*, of October 24, 1968. Although an executive order is not binding upon a court as a matter of statutory construction, the President's reading of a particular statute may, of course, be helpful. Century points out that the President referred only to the transfer of "pending applications," and not to valid pre-existing licenses.

The Order may be read, however, as complementary to a construction of the statute which would effect an immediate ban on the importation of all surplus military firearms. Although the phrase "pending applications" might be read in isolation as excluding validly issued, outstanding licenses, when read with the rest of the Executive Order it appears to assume another meaning. Section 1 of the Order provides

> There are hereby delegated to the Secretary of the Treasury:
>
> * * * * * *
>
> (b) So much of the functions conferred upon the President by Section 414 of the Mutual Security Act of 1954, as amended, as relate to control of the import of arms, ammunition and implements of war * * *. Exec. Order No. 11432, *supra*.

Section 1 of the Order purports to transfer to the Secretary of the Treasury all of the President's functions pertaining to control of the import of firearms. The Order appears to be designed primarily to eliminate the overlapping of functions of the Office of Munitions Control and the Secretary of the Treasury, and to make it clear that an importer would not have to obtain two licenses for each shipment. The transfer of "pending applications" thus can be read as a measure of administrative convenience to insure that the State Department's power to act on licenses would cease at once, but to relieve those

applicants who had already filled out the necessary forms from the burden of duplicating their efforts. There is no indication that every pending application would have to be denied under the new law.

Much is made of the President's omission of any reference to existing licenses. But Congress's omission of any reference to existing licenses is more telling than the President's. Although the Crime Control Act repealed the Federal Firearms Act, Congress expressly stated that the repeal was not intended to invalidate existing licenses under the Federal Firearms Act; rather, those licenses were to continue in effect until they expired by their own terms. Pub.L. No. 90–351 § 907. But any such express continuation of existing licenses was conspicuously left out of the Gun Control Act. It would seem to follow that, had Congress designed the Gun Control Act with an eye to leaving existing licenses to expire by their own terms, it might easily have said so.

This discussion of the Gun Control Act of 1968 has thus far centered on a quite literal reading of the words of the statute. Keeping in mind Judge Learned Hand's further admonition that statutes "should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them," [5] we turn to an examination of the evils this statute was designed to eliminate, or the ends it was designed to serve.

Century's argument that the purpose of the 180-day period between the signing of the Safe Streets Act and the effective date of that act was to give "dealers six months to conclude contract negotiations for the purchase of handguns," and that "in reliance on this transitional phase, plaintiff and other dealers were encouraged to continue with their purchases and apply for licenses" does not sit well. The clear implication of the enactment of an immediate effective date for Sections 922(*l*) and 925(d) of the Gun Control Act, particularly in light of Senator Dodd's remarks, is that the Congress had never intended that the passage of strong controls over the import of firearms be preceded by a "grace period" during which gun importers could stockpile enough firearms to emasculate the new law for several years to come.

Be that as it may, there is no necessity to decide, as plaintiff would have it, whether "[i]n providing this six month period Congress acted to avoid severe financial injury to commercial dealers." The proper matter of concern is with the foreshortening of the six-month period effected by the Gun Control Act. The question is whether the purposes of that legislation are served or defeated by a holding that a ban on the importation of all surplus military firearms was to take immediate effect.

While it may be, as plaintiff argues, that the "principal purpose of the Gun Control Act of 1968 was to control and reduce traffic in firearms because of our domestic war on crime," we are not persuaded that "[t]hat purpose is not achieved by holding plaintiff's licenses invalid," or that "[t]he impact of shotguns and rifles here involved would be insignificant." Repeated reference to the "urgent necessity for adding restrictions on transactions in long guns" [H. R. Rep. No. 1577, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 4413] and the House Judiciary Committee's statement that

> [T]he main purpose of the import restrictions is to *arrest* the present flood of imports of surplus military weapons and low-priced foreign-made firearms generally, since these types of important weapons have caused major law enforcement problems. H.R. Rep. No. 1577, U.S.Code Cong. & Admin.News 1968, p. 4415 (emphasis added).

lead to the conclusion that the impact of $343,192.04 worth of surplus military rifles and shotguns may not be considered "insignificant." Only $388,000 worth of

---

5. Lehigh Valley Coal Co. v. Yensavage, 218 F. 547, 553 (1914).

long gun imports during the month of May apparently provided the impetus for the Horton Amendment in the first place. 114 Cong.Rec. 22779 (1968). See also President Johnson's Message to the Congress on Gun Control Laws ("I urge the Congress * * * to act immediately to control interstate sales of shotguns, rifles and ammunition") [U.S. Code Cong. & Adm.News 1865 (1968)]; Representative Celler on the necessity for speed in the enactment of laws controlling long gun imports, 114 Cong.Rec. 23073 (1968); Representative Schwengel on the rapid rate at which imports of firearms were rising in the first months of 1968, 114 Cong.Rec. 21811 (1968); Senator Fong on the desirability of "immediate enactment" of restrictions on long guns, 114 Cong.Rec. 27135 (1968); Senator Dominick on eliminating "lag time while enforcement procedures are created," 114 Cong.Rec. 27142 (1968). Apparently, too, the impact of two more months of importation of firearms was found to be more significant than two more months of receipt of firearms in interstate commerce by convicted felons, narcotics addicts or mental defectives, as Section 922(g) was not to take effect until December 16, 1968.

It is also of interest to note that import restrictions have in other circumstances been presumed to include goods en route in the absence of express exemption. C. Tennant, Sons & Co. of N. Y. v. Dill, 158 F.Supp. 63, 68 (S.D.N.Y. 1957) (monthly quotas on importation of tung oil).

■ Finally, Century urges that the purposes of the gun law would not be served, and crime would not be reduced, by exclusion of these imports, because the late Dr. Martin Luther King, Jr., was killed with a domestic rifle, the late Robert F. Kennedy was slain with a hand gun, and the $14 Italian surplus military rifle which killed President Kennedy could still be imported into the United States if it came from a source other than the military. Expressing no view on the wisdom of the selective import restrictions chosen by Congress, this particular argument is disingenuous at best. Congress need not find airtight solutions to every evil against which it attempts to legislate.

To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819). See also Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

As the Secretary of the Treasury's interpretation of the Gun Control Act of 1968 is held consistent with the purposes of Congress, we are confronted with the claim that the Act as so construed and applied is violative of Century's rights under the Due Process and/or Just Compensation clauses of the Fifth Amendment, and the request that a three-judge district court be convened accordingly to adjudicate that claim. This point is made although Century itself stated, in support of its argument on construction of the statute, that "It cannot be gainsaid that had Congress intended to prohibit absolutely the importation of surplus military firearms into the United States, it could have done so." (Pl's Mem. on Motion for Summary Judgment, p. 7.)

■ The first inquiry, of course, must be directed to the appropriateness of convening a three-judge court under 28 U.S.C. § 2282 (1964). A three-judge court is not to be convened when the constitutional issue alleged is insubstantial or frivolous; and the initial determination of the substantiality of a constitutional claim is to be made by a single district judge. California Water Service Co. v. City of Redding, 304 U.S. 252, 254, 58 S.Ct. 865, 82 L.Ed. 1323 (1938). The Supreme Court has stated that

[t]he lack of substantiality in a federal question may appear either because

it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject. California Water Service Co., *supra*, at 255, 58 S.Ct. at 867.

As Judge Friendly has pointed out, however, "[i]n the nature of things, these tests cannot be of mathematical precision." Green v. Board of Elections, 380 F.2d 445, 448 (2d Cir. 1967).

■ Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), is formidable precedent for the proposition that the commerce power

> like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than those prescribed in the constitution. 22 U.S. at 196.

And in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), Mr. Justice Stone, speaking for the entire Court, stated

> In the more than a century which has elapsed since the decision of Gibbons v. Ogden, these principles of constitutional interpretation have been so long and repeatedly recognized by this Court as applicable to the Commerce Clause, that there would be little occasion for repeating them now were it not for the decision of this Court twenty-two years ago in Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101. 312 U.S. at 115, 61 S. Ct. 451, 458.

As *Darby* expressly overruled Hammer v. Dagenhart, there is little occasion now for repeating Chief Justice Marshall's view that the commerce power is plenary, subject only to express constitutional limitations. Thus, if the plaintiff here had made no showing of reliance on its pre-enactment import licenses, its claim of unconstitutionality would clearly be frivolous. See Weber v. Freed, 239 U.S. 325, 329, 36 S.Ct. 131, 132, 60 L.Ed. 308 (1915) (contentions that Congress had no power to prohibit the importation of films of pugilistic encounters "so devoid of merit as to cause them to be frivolous"); and Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 191, 6 L.Ed. 23 (1824) (on "the universally acknowledged power of the government to impose embargoes").[6]

■ The difficulty here, then, is with the contracts entered into by Century prior to the enactment of the Gun Control Act of 1968, and the licenses which had given official recognition to the legality of those contracts when entered into. In this Court's view, this difficulty is not one which necessitates determination by a three-judge court.

■ The clause of the Constitution which prohibits impairment of the obligations of contracts applies, by its terms, only to the States, and not to the federal government. U.S. Const. art. I, § 10. But the prohibitions of the Fifth Amendment, on which Century relies, do of course circumscribe to some extent the legislative powers of the Congress. United States v. Darby, *supra*.

In the past it has been said that that which is merely a "privilege" may be taken away at the whim of the legislature, but that the denial of a "right"

6. The Embargo Acts of 1807 and 1808 were never passed upon by the Supreme Court. Presumably Chief Justice Marshall's dictum is based upon the general acceptance of District Judge Davis's opinion in United States v. The William, 28 Fed.Cas. 614 (No. 16,700) (D.Mass.1808) (embargo and forfeiture of violating vessel upheld under commerce clause) where he said, among other things:
 * * * It is well understood, that the depressed state of American commerce, and complete experience of the inefficacy of state regulations, to apply a remedy, were among the great, procuring causes of the federal constitution.
 * * * * *
 It was perceived, that, under the power of regulating commerce, congress would be authorized to abridge it, in favour of the great principles of humanity and justice. Hence the introduction of a clause, in the constitution, so framed, as to interdict a prohibition of the slave trade, until 1808. * * * 28 Fed.Cas. at 620, 621. See also The Federalist, No. 23.

must be accompanied by due process of law. See, e. g., Stone v. Mississippi, 101 U.S. 814, 821, 25 L.Ed. 1079 (1879); Mugler v. Kansas, 123 U.S. 623, 662, 8 S.Ct. 273, 31 L.Ed. 205 (1887). The "right-privilege" distinction has justly been discredited, Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); see Van Alstyne, The Demise of the Right Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968); 2 Schwartz, A Commentary on the Constitution of the United States, p. 874 et seq. (MacMillan 1968).

Century's licenses were valuable to it, and the Secretary's refusal to allow Century to import its guns represents a considerable financial loss, whether the opportunity to import firearms is regarded as a "right" or a "privilege," for it is suggested that if the guns cannot be imported into this country they cannot be sold anywhere. Century's property is at stake here, and that property cannot be taken from Century without due process of law, nor appropriated for public benefit without just compensation. But has either constitutional provision been trespassed?

■■■ If Century's claim is that the mere enactment of an absolute prohibition on the importation of surplus military firearms, when such had been permitted in the past, is violative of due process of law, we might respectfully point out that former *laissez-faire* concepts of substantive or economic due process have gone the way of the "right-privilege" distinction. See Bodenheimer, Due Process of Law and Justice in Essays in Jurisprudence in Honor of Roscoe Pound, pp. 463, 489 (Bobbs-Merrill 1962); Frankfurter, The Constitutional Opinions of Mr. Justice Holmes in Felix Frankfurter on the Supreme Court (Kneeland ed. 1970), pp. 32–37. In Nebbia v. New York, 291 U.

S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), which still sets forth the basic criteria followed today,[7] the Supreme Court stated that

> [t]he Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. 291 U.S. at 525, 54 S.Ct. at 510 (footnotes omitted).

Can it be said that it was unreasonable, arbitrary or capricious as a matter of law for Congress to find that the importation of shotguns and rifles, and more specifically surplus military firearms, created a major impediment to local law enforcement efforts, or that delay in the enactment of strong gun control laws would only increase the magnitude of the problem? Allowing room for the differing opinions of Senators Dirksen, Hruska, Thurmond and Burdick [S.Rep. No. 1097, 90th Cong., 2d Sess. (1968)], it can hardly be held as a matter of law that §§ 922(*l*) and 925(d) (3) represented a capricious assimilation of the collective American experience over the decade which preceded their enactment. Statistics on crimes of violence committed with shotguns and rifles permeate the legislative history of the Gun Control law (e. g., H.R.Rep. No. 1577, General Statement, 90th Cong., 2d Sess., 1968). The relatively low cost of surplus military firearms affords a rational basis for the belief that their importation should be prohibited (id.); Representative Schwengel's statistics on the

---

7. See, e. g., Brotherhood of Locomotive Firemen and Enginemen v. Chicago, R. I. & P. R. Co., 393 U.S. 129, 143, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968); Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

value of firearms imported monthly, 114 Cong.Rec. 23073 (1968), could persuade a reasonable man to eschew delay. As far as Century relies on a theory of substantive due process, then, we see no merit in the claim.[8] Or, to paraphrase Mr. Justice Douglas, we have no desire to see the spectre of *Lochner* stalk again. F.H.A. v. Darlington, Inc., 358 U.S. 84, 92, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

■ If Century's claim be one of denial of procedural due process, it strikes us as equally without merit. Due process need not be judicial process. See Mr. Justice Brandeis concurring in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 77, 56 S.Ct. 720, 80 L.Ed. 1033 (1936); Murrah, C. J. in Garvey v. Freeman, 397 F.2d 600, 612 (10th Cir. 1968).[9]

■ When Congress, as here has, as repeatedly pointed out above, made reasonable findings of fact and embodied them in a reasonably related piece of legislation, its decisions are to be given special deference. Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505 (1934). This is not a case in which an administrative agency, entrusted with the application of general statutory standards to particular factual situations revokes without notice or hearing, or without any explanation of the factual bases of its decision, a license or benefit previously enjoyed by the complaining party. See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). It is, rather, a case in which the facts have been found by Congress, and the standard embodied in the statute leaves no room for administrative discretion. We have difficulty, then, seeing the analogy the plaintiff urges with such cases as Noble v. Union River Logging Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893), in which it was held that the Secretary of the Interior could not rescind a right of way granted by his predecessor in office except through proceedings in a court of law. 147 U.S. at 176, 13 S.Ct. 271.

In a multitude of areas of commercial life in which the Congress has sought to regulate the affairs of men, a licensing system is a fundamental and familiar starting point for a comprehensive regulatory scheme. Licenses are required to transmit radio waves under the Federal Communications Act of 1934, 47 U.S.C. § 307 (1964), to operate an airline under the Federal Aviation Act, 49 U.S.C. § 1371(a) (1964), and so on. Under state laws, we need licenses to drive cars, 23 V.S.A. § 601 (1949); to sell liquor, 7 V.S.A. § 221 et seq. (1955); and to engage in some of the oldest professions, 26 V.S.A. § 913 (1969) (embalming); 26 V.S.A. § 264 (barbers). Yet we are aware of no licenses which once granted, can never be taken away. As an example only, the Federal Communications Act establishes standards for the approval of a license application by the Commission and provides for the revoca-

---

8. "The doctrine that prevailed in *Lochner*, [Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937], *Coppage* [Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441], *Adkins* [Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785], *Burns* [Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813], and like cases— that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." Black, J., for the Court in Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).

9. The instant case is, of course, *a fortiori* to cases such as Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) and Farrell v. Joel, 437 F.2d 160 (2d Cir. Jan. 20, 1971), which almost appear to permit *de minimus* violations of due process, since here involved is the regulation of a private business, not deprivation of personal rights. But cf. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

tion of a license when a licensee fails to meet the standards of performance required by the Act. A license to operate a radio or television station in a large city can be a valuable commodity. But if the holder of the license engages in activities inimical to the public convenience and necessity, his license may be taken away. See Red Lion Broadcasting Co., Inc., v. F.C.C., 395 U.S. 367, 389, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

 It is axiomatic that if Congress can delineate general standards for the grant or denial of a license under a federal regulatory scheme, and permit a commission to find facts and apply the law to those facts, Congress itself can determine the facts, and can write more stringent standards into a regulatory scheme. That Congress wished to divest the Secretary of discretion under the Gun Control Act is plainly evident from the remarks of both the Act's supporters and its detractors. Representative Horton, 114 Cong.Rec. 22780 (1968); Representative Dingell, 114 Cong.Rec. 22779 (1968); Senator Hruska, 114 Cong.Rec. 27123 (1968). Thus we find insubstantial plaintiff's argument that once the federal government issues a license, and the license is relied upon, the license can never be revoked consistent with due process of law, until it should expire by its own terms.

 The plaintiff argues, apparently in the alternative, that, because it cannot sell its guns anywhere but in the United States, the Secretary's refusal to permit the importation of these guns amounts to appropriation of its property without just compensation. Accepting the premise that it cannot sell its guns elsewhere as true, even if it could successfully be argued that the Secretary's action (or the action of Congress) amounts to a taking for "public use," U.S.Const. Amend. V, the eminent domain argument has been so conclusively rejected by the Supreme Court as to obviate the need for a three-judge court. A diminution in the value of private property incidentally occasioned by the enactment of a federal statute does not amount to a taking of that property requiring monetary compensation. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 260–261, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); and cf. Jimmie's Incorporated v. City of West Haven, 436 F.2d 1339 (2d Cir. Jan. 18, 1971).

In the Legal Tender Cases, 12 Wall. 457, 79 U.S. 457, 20 L.Ed. 287, decided in 1870, the Supreme Court observed that

> As in a state of civil society property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority. 79 U.S. 457, 551 (1870).

The Court went on to point out that

> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? 79 U.S. at 551.

In Louisville & Nashville R.R. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911), the Supreme Court, relying on Knox v. Lee, 79 U.S. (12 Wall.) 457, 20 L.Ed. 287 (1870), held unenforceable a lifetime railroad pass accepted by the plaintiffs in settlement of a personal injury claim:

> The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between indi-

viduals or corporations, is inconceivable. The framers of the Constitution never intended any such state of things to exist. 219 U.S. at 482, 31 S.Ct. at 270.

Gibbons v. Ogden itself invalidated an exclusive license issued to Robert Fulton and Robert Livingston by the state of New York, 22 U.S. (9 Wheat.) 1 (1824).

▇▇ In Norman v. Baltimore & O. R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L. Ed. 885 (1935), the Court stated that

Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot: remove their transactions from the reach of dominant constitutional power by making contracts about them. 294 U.S at 307–308, 55 S.Ct. at 416.

Although the wisdom of the "congenital infirmity" formula has been questioned, see Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692, 700, n. 44 (1960), it is established constitutional doctrine that individuals cannot cripple the functions of the legislature, otherwise properly exercised, by contractual agreement. Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (upholding Minnesota statute temporarily extending redemption period on existing mortgages); Atlantic Coast Line R. Co. v. City of Goldsboro, 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721 (1914) (upholding local safety ordinances against railroad's due process and eminent domain arguments); Douglas v. Kentucky, 168 U.S. 488, 18 S.Ct. 199, 42 L.Ed. 553 (1897) (sustaining Kentucky's authority to legislate against the "widespread pestilence of lotteries," prior licenses and franchises notwithstanding.)

Dobbins v. Los Angeles, 195 U.S. 223, 25 S.Ct. 18, 49 L.Ed. 169 (1904), invalidated a Los Angeles city ordinance which changed the city's zoning regulations after the plaintiff, in reliance on an earlier ordinance and a duly issued building permit, had expended considerable sums in the erection of a gasworks. The Court was persuaded that "[n]o reasonable explanation for the arbitrary exercise of power·in the case is suggested." 195 U.S. at 239, 25 S.Ct. at 21. But the Court was careful to acknowledge the state's power to enact similar legislation, if reasonable, and if necessitated by circumstances, "notwithstanding the grant of the permit":

\* \* \* In other words, the right to exercise the police power is a continuing one, and a business lawful to-day may, in the future, because of the changed situation, the growth of population or other causes, become a menace to the public health and welfare, and be required to yield to the public good. 195 U.S. at 238, 25 S.Ct. at 21.

More recently, the Supreme Court has sustained Congress' power to terminate, by a change in existing regulations, accrued Social Security benefits of an alien subsequently deported, Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L. Ed.2d 1435 (1960); its power to clarify, and thereby impose additional restrictions on, the uses to which federal mortgage money might be put, F.H.A. v. Darlington, Inc., 358 U.S. 84, 79 S.Ct. 141 (1958); and its power to demand renegotiation of wartime contracts with return to the government of excess profits, Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). The Second Circuit Court of Appeals upheld the validity of the Portal-to-Portal Pay Act of 1947, which relieved employers of overtime pay liability, Battaglia v. General Motors, 169 F.2d 254 (2d Cir.), cert. denied, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).[10]

---

10. It is interesting to note that no constitutional issue was even raised by a manufacturer of lawn darts when they were regulated as "hazardous substance[s]" under the Child Protection and Toy Safety Act of 1969. R. B. Jarts, Inc. v. Richardson, 438 F.2d 846 (2d Cir. Jan. 19, 1971). If lawn darts, why not guns?

Mere allegations, without more, of the arbitrary exercise of power do not suffice to raise a constitutional question of substantiality requiring the convention of a three-judge district court. Brotherhood of Locomotive Firemen & Enginemen v. Certain Carriers, 118 U.S.App.D.C. 100, 331 F.2d 1020, 1022, cert. denied, 337 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964).

Accordingly, the plaintiff's motion for summary judgment, and in the alternative for the convention of a three-judge court is hereby denied. The Government's motion to dismiss for failure to state a claim on which relief can be granted is hereby granted.