**B-WEST IMPORTS, INC., Hing Long Trading Co., K–Sports Imports, Inc., Eagle Exim, Inc., Briklee Trading Co., Century Arms, Inc., Intrac Corporation, Northwest Imports, J's Pacific Enterprise, Inc. and Sportsarms of Florida, Plaintiffs,**

v.

**UNITED STATES, et al., Defendants.**

**Slip Op. 95–28.**
**Court No. 94–06–00371.**

United States Court of International Trade.

Feb. 24, 1995.

O'Connor & Hannan (Donald R. Dinan, William W. Nickerson and Craig A. Koenigs), for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Jeffrey M. Telep), Bradley A. Buckles, Imelda Koett and Teresa Ficaretta, Bureau of Alcohol, Tobacco & Firearms, U.S. Dept. of Treasury, of counsel, Orde Kittrie, Atty. Advisor, Office of the Legal Advisor, U.S. Dept. of State, of counsel, Ellen McClain, Office of Chief Counsel, U.S. Customs Service, of counsel, for defendants.

## OPINION

RESTANI, Judge:

This action is before the court on cross-motions for summary judgment made pursuant to USCIT Rule 56 by defendants United States, et al., and plaintiffs B–West Imports, Inc., Hing Long Trading Co., K–Sports Imports, Inc., Eagle Exim, Inc., Briklee Trading Co., Century Arms, Inc., Intrac Corporation, Northwest Imports, J's Pacific Enterprise, Inc. and Sportsarms of Florida. Plaintiffs, importers of munitions, challenge the decision of the Bureau of Alcohol, Tobacco & Firearms ("ATF") of the United States Department of the Treasury banning the importation of defense articles[1] from the People's

Republic of China ("China") instituted under section 2778 of the Arms Export Control Act ("AECA"). 22 U.S.C. § 2778 (1988).

### Facts

On May 26, 1994, President Clinton announced the renewal by the United States of Most Favored Nation trading status to China. In light of "continuing human rights abuses," however, the President declared a ban on the "import of munitions, principally guns and ammunition from China." Following the President's announcement, Secretary of State Warren Christopher issued a letter to Secretary of Treasury Lloyd M. Bentsen, advising him of the termination of China's exemption from the list of proscribed countries from which defense articles may not be imported. The letter further advised the Treasury Department to "take all necessary steps to prohibit the import of all defense articles enumerated in the U.S. Munitions List." As authority for this action, Secretary Christopher cited section 38 of the AECA, codified at 22 U.S.C. § 2778, and Executive Order No. 11,958, 42 Fed.Reg. 4311 (1977), *reprinted as amended in* 22 U.S.C. § 2751 note (1988) (Ex.Ord. No. 11,958. Administration of Chapter).

The United States Customs Service ("Customs") responded with an administrative notice dated May 27, 1994, ordering all "tariff commodities from China" to be detained until further notice. On May 31, 1994, Customs limited the detention to all shipments of "Chapter 93 tariff commodities[2] exported from China regardless of the country of origin." This was followed by a more detailed

---

1. The statute defines "defense article" as:

    (A) any weapon, weapons system, munition, aircraft, vessel, boat, or other implement of war,
    (B) any property, installation, commodity, material, equipment, supply, or goods used for the purposes of making military sales,
    (C) any machinery, facility, tool, material, supply, or other item necessary for the manufacture, production, processing, repair, servicing, storage, construction, transportation, operation, or use of any article listed in this paragraph, and
    (D) any component or part of any article listed in this paragraph. . . .

22 U.S.C. § 2794(3) (1988). Defense articles are also defined as "the items on the United States Munitions List pursuant to [22 U.S.C. § 2778]." 50 U.S.C. § 415(b)(2) (1988). There is no dispute that the articles at issue are defense articles and are also on the U.S. Munitions List.

2. Chapter 93 of the Harmonized Tariff Schedule of the United States ("HTSUS") covers arms and ammunition, and parts and accessories thereof, such as military weapons, machine guns, revolvers, and pistols, other firearms and similar devices which operate by the firing of an explosive charge, bombs, grenades, torpedoes, missiles and similar munitions of war, and swords, lances, bayonets and similar arms. HTSUS, USCIT Pub. 2690, sec. XIX, ch. 93 (Supp. 1 1994).

administrative notice on June 7, 1994, indicating that, as of May 28, 1994, 12:01 a.m. EDT, all articles from China on the U.S. Munitions List were prohibited from importation. Additionally, any current permits to import such articles from China were declared null and void. Defense articles imported into the United States prior to the embargo were also banned from importation if no entry had been filed with Customs, or if the articles were imported into a bonded warehouse or foreign trade zone. These articles, however, were permitted exportation back to China or the country of origin without State Department approval if returned prior to June 30, 1994. The following day, Customs issued a revised notice adding that exceptions to the embargo could be made on a case-by-case basis if a request was submitted to Customs Headquarters.[3]

On June 27, 1994, the ATF issued notices to affected importers advising them of the import ban and the revocation of their existing import permits. The notice informed importers that requests may be made within 30 days of receipt of the letter "for an opportunity to present additional information and to have a full review of [their] case by the [ATF]." Further, importers seeking an exception to the import ban were required to file new permit applications along with "an explanation of why the importation [was] in accordance with the security and foreign policy of the United States." These applications would be referred to the State Department for consideration.

Customs issued a notice dated August 5, 1994, clarifying which defense articles were subject to import restrictions under the embargo. The notice provided that those articles entered into the geographical territory of the United States[4] on or after May 28, 1994 were subject to the import ban. Thus, defense articles within United States territo-ry prior to that date, whether in foreign trade zones, a Customs bonded warehouse, or on a dock unentered, were not subject to import restrictions. These articles would be permitted entry, provided the importers obtained new import permits from the ATF.

The notice further provided that imported articles subject to the embargo could either be (1) returned to China or the country of origin by August 31, 1994 without State Department approval, (2) retained in a bonded warehouse until an export license was obtained if not exported prior to August 31, 1994, or (3) destroyed under Customs' supervision. The ATF issued a subsequent letter dated August 10, 1994 informing affected importers of Customs' notice and specifying the documentation to be submitted with new permit applications by importers seeking a foreign policy exception from the State Department.

Congress incorporated the terms of the embargo into the Act of Aug. 26, 1994, Pub.L. No. 103–317, § 609, 108 Stat. 1724, 1774 (1994) ("Craig Amendment"), creating an additional exception. The Craig Amendment provided relief from the import ban to those importers who possessed valid import permits before May 26, 1994, and whose products had either been "in a bonded warehouse or foreign trade zone, in port, or, as determined by the United States on a case-by-case basis, in transit."[5] In letters issued September 6, 1994, the ATF specified the application procedures for those importers seeking relief under this additional exception.

Plaintiffs allege that (1) the AECA does not authorize the President and the administering agencies to impose an import embargo, (2) the acts by Customs and the ATF invalidating and revoking existing import licenses were *ultra vires,* and (3) the implementation of the embargo, with respect to "in

---

3. Defendants have indicated that Customs is not processing applications for exception from the import ban.

4. As defined in the August 5th Customs notice, "geographical territory" was "the port limits of the particular U.S. port at which the merchandise arrived and includes merchandise in a foreign trade zone or a Customs bonded warehouse."

5. The ATF interpreted "in transit" to include articles that left port in China consigned to a U.S. importer on or before May 26, 1994. Plaintiffs challenge to the ATF's interpretation of "in transit" was not raised in their complaint and thus is not at issue in this action.

transit" goods was arbitrary, capricious and contrary to the stated objectives of the embargo. Plaintiffs also raise constitutional claims contending the embargo violated the Due Process Clause and Takings Clause of the Fifth Amendment. Defendants oppose these contentions, additionally alleging that plaintiffs have failed to exhaust their administrative remedies.

## Standard of Review

Summary judgment is appropriately granted where the pleadings and affidavits show no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. USCIT Rule 56(d); *e.g., Pfaff Am. Sales Corp. v. United States*, 16 CIT 1073, 1075, 1992 WL 391085 (1992).

## Discussion

I. *Exhaustion of Administrative Remedies*

■ Defendants have submitted documents indicating that some or all of the plaintiffs have filed applications seeking relief from the import ban. According to defendants, the avenues of relief available to affected importers were (1) an exception granted under the Craig Amendment, (2) a foreign policy exception granted by the State Department, and (3) full review of their case by the ATF. To date, all of the plaintiffs[6] have applied for relief under these various administrative proceedings and, although some have been granted relief for their products, many plaintiffs still have applications pending. Thus, defendants ask the court to dismiss plaintiffs' complaint for failure to exhaust its administrative remedies. The court declines to do so.

■ Congress has directed that this court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (1988); *see, e.g., Encon Indus., Inc. v. United States*, Slip Op. 94–145, at 3, 1994 WL 520917 (Sept. 19, 1994); *Borusan Holding A.S. v. United States*, 16 CIT 278, 284, 1992 WL 82493 (1992). Unless exhaustion of administrative remedies, however, is mandated by statute, it is within the discretion of the court to apply the exhaustion doctrine. *Ceramica Regiomontana, S.A. v. United States*, 16 CIT 358, 359, 1992 WL 107338 (1992); *Timken Co. v. United States*, 10 CIT 86, 92–93, 630 F.Supp. 1327, 1334 (1986). Thus, the court need not require exhaustion in "exceptional cases or particular circumstances ... where injustice might otherwise result," *see Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 134–35, 583 F.Supp. 607, 609–10 (1984) (quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941)), nor should exhaustion operate to prevent a reasonable opportunity to object to significant agency action. *See American Maritime Ass'n v. United States*, 766 F.2d 545, 566 n. 30 (D.C.Cir. 1985).

In the present case, plaintiffs are challenging a significant agency action, the import embargo, where the administrative remedies proffered to plaintiffs were not clearly delineated by the administering agencies. The bases upon which plaintiffs were to submit requests for a full review of their case by the ATF or an exception from the State Department were general and were modified or became more specific only after subsequent notices had been issued. The Craig Amendment provided yet another basis for relief from the import ban for "in transit" goods, under which plaintiffs were required to submit a new application for relief, or, if needed, to supplement existing applications. Further, the procedures outlined in the administrative notices failed to indicate, nor have defendants provided, any time frame for the ATF or State Department to complete their deliberation of plaintiffs' applications for relief. This fact is particularly important, as the exhaustion of administrative remedies is not mandated by statute and thus the statute of limitations for plaintiffs to bring their claims is not tolled. Failure to address plaintiffs' challenge to the import embargo now may result in forfeiture of their judicial remedies.

Finally, plaintiffs are not merely alleging an irregularity in the agency proceedings, but rather challenge the legality of the im-

---

6. As J's Pacific Enterprise, Inc. was added as a plaintiff after oral argument, it is unclear whether they have sought relief under any of the remedies noted above.

port embargo. Thus, the purposes of exhaustion, such as to prevent premature interference with agency proceedings so that it may have the opportunity to correct its own errors, may not be served by requiring plaintiffs to exhaust administrative remedies. *See Bowen v. City of New York*, 476 U.S. 467, 484, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986) (noting that agency's system-wide policy for determining eligibility for disability benefits, inconsistent with established regulations, did not require claimants to exhaust administrative remedies even though some claimants would have received benefits despite illegal policy). Based on these considerations, the court declines to require that plaintiffs exhaust the administrative remedies available.

## II. *Authority Granted under the AECA*

Section 2778 of the AECA provides:

In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

22 U.S.C. § 2778(a)(1). Executive Order No. 11,958 expressly delegates to the Treasury Department the authority to control the import of defense articles and defense services, "guided by the views of the Secretary of State on matters affecting world peace, and the external security and foreign policy of the United States." [7] 22 U.S.C. § 2751 note, § 1(*l*)(2), at 718. Pursuant to this delegated authority, the Treasury Department has promulgated regulations pertaining to the importation of defense articles, and has maintained a designated list of such items, the U.S. Munitions List. *See* 27 C.F.R. §§ 47.1–.63 (1994); *see also* 27 C.F.R. Parts 178, 179 (1994) (pursuant to 27 C.F.R. § 47.2(b), defense articles regulated under Parts 178 and 179 are subject to import permit procedures thereunder). In order to effect the President's decision to ban imports of defense articles from China, the Secretary of State terminated China's exemption from the list of proscribed countries whose defense articles were subject to import restrictions. *See* 27 C.F.R. § 47.52. Consequently, Customs prohibited the import of such articles[8] and the ATF revoked all existing import permits as of May 28, 1994.

■ Plaintiffs contend that the congressionally-delegated authority under the AECA, "to control the import . . . of defense articles," does not authorize the administering agencies to declare and impose an import embargo on defense articles. Specifically, plaintiffs argue the term "control" as it is used in the statute is not prohibitory language, but rather is only intended to impose a regulatory and licensing framework on the import and export of defense articles.

■ *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), describes the standard to be applied to determine whether or not an agency has acted within the authority granted by Congress. *Chevron* indicates that

[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. . . . for the court, as well as the agency, must give effect to the

---

**7.** Executive Order No. 11958 delegates to the Secretary of State the authority to, *inter alia*, control the export of defense articles. 22 U.S.C. § 2751 note, § 1(*l*)(1), at 718.

**8.** Pursuant to ATF regulations, Customs is authorized to

take appropriate action to assure compliance with [27 C.F.R. Part 47] and with 27 C.F.R. Parts 178 and 179 as to the importation or attempted importation of articles on the U.S. Munitions Import List, whether or not authorized by permit.

27 C.F.R. § 47.56(a).

unambiguously expressed intent of Congress. If, however, the court determines [that] . . . the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). In addition, the court notes that in areas of foreign policy, an agency is given even broader discretion to interpret statutorily-granted authority. *See Samora v. United States,* 406 F.2d 1095, 1098 (5th Cir.1969) (noting that authority given to President may be broader, and requisite standards more general, in matters of foreign policy than in matters purely domestic) (citing *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965)).

Based on a plain reading of the statute, the court does not find that Congress expressly articulated a policy with regard to the prohibition or banning of certain defense articles. The statute at issue does not define the term "control," and the legislative history does not offer further guidance as to the interpretation of the term. Furthermore, Congress has not defined the standard or means by which defense articles would be "controlled" with any great precision. Except in limited circumstances, there is no contrary language in the statute indicating congressional intent to limit the President's authority to control the import and export of defense articles which he may deem necessary to further the "foreign policy of the United States." *See* 22 U.S.C. § 2778(b)(2) (stating that no license shall be required for imports and exports made by U.S. agency for either official use or for carrying out any authorized foreign assistance or sales program).

■ Ordinarily, the word "control" means "[t]o exercise restraining or directing influence over; regulate; restrain; dominate; curb; to hold from action; . . . govern." *See Black's Law Dictionary* 399 (4th ed. 1951); *see also Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (indicating that in statutory construction, unless otherwise defined, words take on their

ordinary, common meaning). Section 2778 clearly grants the administering agencies a measure of discretion in determining the method to be used to control the import and export of such products. Contrary to plaintiffs' contention, the term "control" is not limited to control by licensing. The language of the statute was apparently cast in broad terms in order to encompass all situations falling within the scope of the stated objectives of the statute. *See* 22 U.S.C. § 2778(a)(1). When Congress uses broad language in delegating authority to the President in the area of foreign relations, absent contrary language in the statute or legislative history, the court assumes "the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act." *South P.R. Sugar Co. v. United States,* 334 F.2d 622, 632, 167 Ct.Cl. 236 (1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965).[9]

■ If Congress wanted to limit the President's authority to "control" the trade of defense articles, it could have used more precise language indicating such intent. Instead, Congress delegated such decisions to the executive branch and the administering agencies' authority to promulgate implementing regulations, thus conferring broad discretion in determining whether or not to allow certain defense articles into the United States. Therefore, the court finds that the imposition of the import embargo under the AECA was a permissible construction of the statute and not inconsistent with statute's stated purposes. The court notes, however, that the administering agencies' regulatory action taken pursuant to the AECA is *ultra vires* and void if it is beyond the scope of the delegated authority. *See Target Sportswear, Inc. v. United States,* Slip Op. 95–7, at 10–11, 1995 WL 32996 (Jan. 23, 1995). Hence, the court turns to the legality of the ATF's administration of the statute.

**III.** *ATF's Regulatory Implementation of the AECA*

■ Plaintiffs admit that the ATF has "the authority to effectively block the impor-

---

9. In fact, plaintiffs readily concede this point, stating that "grants of authority to the President in the area of foreign policy should be construed broadly." Pls.' Resp. Defs.' Mot.Summ.J. at 7.

tation of munitions through the use of licensing." Pls.' Resp. Defs.' Mot. Summ. J. at 10. They further admit that "the ATF reasonably may have construed the term 'control' to mean that the importation of defense articles effectively can be prohibited through the licensing process." *Id.* at 9. Plaintiffs allege, however, that this authority is limited to the ATF's denial of new import permits, and does not allow the revocation of existing import permits to achieve that purpose. The court disagrees with this construction of the statute.

Revocation by an agency of existing privileges or licenses to import into the United States, where such importation was found to be inconsistent with statutory policy, has met with approval in the courts. *See Ganadera Indus., S.A. v. Block,* 727 F.2d 1156, 1159–60 (D.C.Cir.1984) (upholding agency's revocation of company's privilege to import meat and meat products where such importation was not in compliance with statutory standards); *Century Arms, Inc. v. Kennedy,* 323 F.Supp. 1002, 1016–17 (D.Vt.) (approving of Treasury Department's revocation of existing import licenses for surplus military firearms, prohibited from importation by recent legislation), *aff'd,* 449 F.2d 1306 (2d Cir.1971) (per curiam), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972). In *Century Arms,* the court noted that in a comprehensive regulatory scheme with a licensing system, it was "aware of no licenses which once granted, can never be taken away." 323 F.Supp. at 1016. Thus, the court dismissed plaintiffs' argument that "once the federal government issues a license, and the license is relied upon, the license can never be revoked consistent with due process of law, until it should expire by its own terms." *Id.* at 1017.

█ Further, the denial or revocation of an import permit or license can, under cer-

tain circumstances, be a reasonable means to implement an embargo, and indeed, as the ATF states in its regulation, "[i]t is the policy of the United States to deny licenses and other approvals with respect to [imports of] defense articles and defense services originating in certain countries." *See* 27 C.F.R. § 47.52; *see also* 22 C.F.R. § 126.1(a) (Department of State's similar listing of proscribed countries). Given the termination of China's exemption from import restrictions, and the ATF's expressly delegated authority under the AECA, the court finds the ATF's consequent revocation of the authority to import under existing permits to be reasonable and not arbitrary, capricious or manifestly contrary to the purposes of the statute.[10] *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 ("[C]onsiderable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer.").

█ Plaintiffs also contend that the ATF's revocation of their import permits was *ultra vires,* as the ATF allegedly did not have the authority to do so under the regulations cited. In revoking plaintiffs' import permits, the ATF specifically cited 27 C.F.R. § 47.44 as authority for its action, which provides that permits issued under that subpart may be "denied, revoked, suspended or revised without prior notice whenever the [ATF] finds the proposed importation to be inconsistent with the purpose or in violation of [22 U.S.C. § 2778] or the regulations in this part." 27 C.F.R. § 47.44. The scheme of the regulations provide, however, that the permit procedures of Part 47 of the C.F.R. are only applicable to those articles on the U.S. Munitions List that are not subject to import control under 27 C.F.R. Parts 178 (regulating firearms and ammunition) and 179 (regulating machine guns, destructive devices and certain other firearms). The regu-

---

10. Plaintiffs further argue that Customs' actions in detaining the subject merchandise was *ultra vires* because plaintiffs possessed valid import permits that the ATF did not revoke until June 27, 1994. Plaintiffs' contention is without merit. Customs is authorized to take the appropriate action necessary to assure compliance with ATF regulations as to the importation of defense articles, whether or not authorized by permit. *See supra* note 8. As China's exemption from the list

of proscribed countries prohibited from importing defense articles was terminated, importation became contrary to the stated policies of the ATF with respect to such countries. *See* 27 C.F.R. § 47.52; App. to Defs.' Mem.Supp. Mot. Summ. J., Ex. 5, at 1–2 (Customs' June 7, 1994 administrative notice). The court finds no error in this regard with Customs' implementation of the AECA and the regulations promulgated thereunder.

862

lations under Parts 178 and 179 contain, *inter alia,* specific procedures for the licensing of importers to deal in defense articles, as well as permit procedures for the importation of such goods.

Plaintiffs contend, and defendants concede, that plaintiffs' defense articles are regulated under Parts 178 and 179. Plaintiffs' contention, however, that these provisions do not authorize the revocation of their import permits, is without merit. The regulations concerning importation of defense articles under Part 178 expressly provide that

> [n]o firearm, firearm barrel, or ammunition shall be imported or brought into the United States by a licensed importer ... unless the [ATF] has authorized the importation of [such products].

27 C.F.R. § 178.112(a).[11] As of May 28, 1994, the ATF has not authorized the importation of defense articles from China, and, as a result, all outstanding permits became null and void. *See* App. to Defs.' Mem.Supp.Mot. Summ.J., Ex. 5, at 2. As indicated, this is a permissible construction by the ATF of the congressional grant of authority under the AECA. Further, although Part 47 has specific provisions on revocation of permits, there is no language in Parts 178 or 179 expressly providing for or prohibiting the revocation of an import permit.[12] Under the regulatory scheme set forth, the court finds that the ATF's delegated authority in this situation has not been limited. Thus, it is unnecessary to reach the issue of whether the specific permit revocation provisions of Part 47 would also permit revocation of permits to importers licensed under Parts 178 and 179. Although the defense articles at issue are subject to importer licensing and permit requirements under Parts 178 and 179, the court finds that the ATF had authority to revoke current import permits in order to achieve the stated purpose of the embargo.[13]

Finally, plaintiffs allege that the ATF's actions were arbitrary, capricious and contrary to the purpose of the statute. The court disagrees. Ordinarily, Congress may delegate authority to the executive branch, if it specifies the basic principles to be advanced. *See J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928) ("If Congress shall lay down by legislative act an intelligible principle to which the [President] is directed to conform, such legislative action is not a forbidden delegation of legislative power."). Section 2778(a) clearly lays down an intelligible principle to which the President must conform, that is, the President may control defense articles in the "furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1); *see Samora,* 406 F.2d at 1098 (finding similar language in munitions control statute to be "sufficiently defined and the standards sufficiently definite"). The parties do not dispute that the President exercised his discretion and acted in what was in his judgment the furtherance of world peace, security, and foreign policy when he instituted the arms embargo against China. In fact, plaintiffs concede that the Chinese munitions embargo "was done for the articulated reasons of foreign policy." Pls.' Resp. Defs.' Mot.Summ.J. at 7. The President specifically stated that the embargo was to sanction China for its abuse of human rights—rights which the United States has long espoused. If the ATF were to wait for any outstanding

**11.** The permit procedures of Part 178 are incorporated by reference into Part 179. *See* 27 C.F.R. § 179.111(b).

**12.** The only provision in Part 178 dealing with the revocation of an importer's right to import defense articles is in the context of an importer's license, not a permit for entry of a particular quantity of goods. Under 27 C.F.R. § 178.73, the ATF is required to provide a pre-revocation opportunity for a hearing in the case of a willful license violation. This provision does not apply

here as an importer license revocation is not at issue.

**13.** If the ATF's citation to Part 47 was in error, it is of no import as revocation of plaintiffs' existing permits was permissible under Parts 178 and 179, and plaintiffs have demonstrated no prejudice resulting from the citation itself. *Cf. Belcher v. Director, OWCP,* 895 F.2d 244, 246 (6th Cir. 1989) (holding that agency's application of wrong regulation was harmless error as petitioner failed to establish total disability meriting benefits under either provision).

licenses to expire, importers of such defense articles could purchase and import large quantities of Chinese goods under the outstanding permits, thereby partially defeating the President's goal. Therefore, it was reasonable for the ATF to immediately effectuate the embargo to advance the President's foreign policy decision to the maximum extent in order to sanction China for its abuses of human rights. Thus, the court does not find ATF's actions to have been arbitrary, capricious or not in accordance with law.

## IV. *Plaintiffs' Challenge under the Due Process Clause and Takings Clause of the Fifth Amendment*

### A. Due Process Challenge

Plaintiffs' constitutional claim rests in part on its contention that the imposition of the Chinese munitions embargo violated the due process requirements of the Fifth Amendment. *See* U.S. Const., amend. V, cl. 3. Specifically, plaintiffs rely upon the principle that the government may not deprive a person of a protected property interest without providing constitutionally adequate procedural safeguards. *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985).

■ Plaintiffs raise two arguments in support of their claim. First, plaintiffs contend that the government restricted their legal right to import Chinese defense articles under existing validly-issued import permits, between the time the embargo was enforced and June 27, 1994, the point at which the ATF, according to plaintiffs, revoked those permits. Plaintiffs' argument is flawed in that the ATF's authorization of existing import permits became null and void as of May 28, 1994, the same date that the embargo was put in place. *See supra* note 8. Contrary to plaintiffs' assertion, the June 27, 1994 letter was not the date of revocation of existing permits, but rather constituted notice to affected importers. As indicated, Customs and the ATF were authorized to implement the ban on Chinese munitions by revoking existing import permits, thus plaintiffs possessed no legal right to import their products.

■ Defendants claim that plaintiffs' interest in its current import permits does not rise to the level of a protectable property interest implicating due process concerns, but rather is only a unilateral expectation of doing business in the United States. Although plaintiffs do not challenge this contention directly, the court will address this point as it appears to underlie some of plaintiffs' arguments.

■ It is well settled that no one has a constitutionally-protected right to import products excluded by Congress. *See The Abby Dodge v. United States,* 223 U.S. 166, 176–77, 32 S.Ct. 310, 313, 55 L.Ed. 390 (1912) (determining that "no one can be said to have a vested right to carry on foreign commerce with the United States"); *Buttfield v. Stranahan,* 192 U.S. 470, 493, 24 S.Ct. 349, 354, 48 L.Ed. 525 (1904) (stating that because of Congress' complete power over foreign commerce, "no individual has a vested right to trade with foreign nations which is so broad in character as to limit and restrict the power of Congress to determine what articles ... may be imported into this country and the terms upon which a right to import may be exercised"); *Arjay Assocs., Inc. v. Bush,* 891 F.2d 894, 896 (Fed.Cir.1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress."); *Ganadera Indus.,* 727 F.2d at 1160 (finding no constitutionally-protected right to import). These cases, however, do not squarely address the issue of whether, by virtue of granting a permit or license to import products, the government has conferred a "legitimate claim of entitlement" invoking the government's constitutional obligations under the Due Process Clause. *But see Century Arms,* 323 F.Supp. at 1017 (finding that Congress, in enacting statute prohibiting importation of surplus military firearms, divested agency of discretion to honor previously issued import permits, thus revocation of license not inconsistent with due process). The Supreme Court has noted that "[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Board of Regents of State Colleges*

*v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Cleveland Bd. of Educ.,* 470 U.S. at 538, 105 S.Ct. at 1491. Thus, in other contexts licenses have been found to constitute a protectable property interest for licensees, implicating due process concerns, where it has been found that state law creates a legitimate claim to entitlement. *See Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (horse trainer's license); *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) (driver's license).

In the present case, plaintiffs cannot point to any statutory provision granting them a legitimate claim of entitlement to import defense articles from China. The AECA only provides that

> no defense articles or defense services designated by the President ... may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter.

22 U.S.C. § 2778(b)(2). The court does not find that this or any other provision grants plaintiffs any entitlement to the continued importation of defense articles once a license has been issued. Rather it leaves such decisions to the President and to the agency to promulgate regulations to implement his authority. *See id.* § 2778(a)(1). Further, as previously noted, *supra,* the President was given broad discretion to control the import and export of defense articles in furtherance of foreign policy. Thus, the court finds that the ATF's revocation of plaintiffs' import license, which effectuated the President's decision to ban the importation of Chinese defense articles, did not require protection of due process rights. *See American Ass'n of Exporters and Importers–Textile and Apparel Group v. United States,* 751 F.2d 1239, 1250 (Fed.Cir.1985) (finding that imposition of quotas by President under Agriculture Act of 1956, did not violate due process as no statute or international agreement conferred importers with basis for entitlement or proprietary interest); *Ganadera Indus.,* 727

F.2d at 1160 (holding that statute prohibiting importation of adulterated or misbranded meat and meat products, "affords no entitlement," thus no right to advance notice and hearing was available).

■ Plaintiffs' second argument is that the government deprived plaintiffs of their "ability to use, sell, transfer or control" their Chinese munition imports subject to the embargo. Plaintiffs contend they were permitted only two courses of action once the articles were prohibited entry into the United States: (1) destruction of the property under Customs' supervision, or (2) return back to Chinese manufacturers who allegedly have a "no refund" policy. Plaintiffs' contention is erroneous.

Customs' administrative notice of August 5, 1994, and the ATF's subsequent letter of August 10, 1994, specifically provided that imported articles subject to the embargo could either be: (1) returned to China or country of origin by August 31, 1994 without further governmental approval, (2) retained in a bonded warehouse until an export license was obtained, if not exported prior to August 31, 1994, (3) excepted from the ban (determined on a case-by-case basis), if requested by the importer, or (4) destroyed under Customs' supervision. *See* Pls.' Mem. P. & A. Supp. Mot. Summ. J., Exs. F–G. Thus, plaintiffs were not limited only to the choices of destruction or returning goods to the manufacturer. Further, plaintiffs cite no additional support indicating the embargo compromised plaintiffs' "ability to use, sell, transfer or control" its products.[14] The only potential property interest compromised by the import embargo was plaintiffs' ability to import its products into the United States, which the court finds not to constitute a protectable property interest triggering due process protection. Thus, plaintiffs' argument fails.

**B. Takings Clause Challenge** [15]

■ Plaintiffs' contention that the government has taken its property without

---

**14.** Presumably, if no market existed in China for the merchandise, it could be reshipped to another non–U.S. destination. Plaintiffs have not demonstrated the contrary.

**15.** Defendants urge the court to decline to exercise jurisdiction over plaintiffs' takings claim,

just compensation under the Takings Clause of the Fifth Amendment is similarly without merit. Again, plaintiffs' challenge is based on their assertion that the government's regulatory actions deprived them of use, title, possession and control over their goods by limiting plaintiffs to two options for the disposal of their property. As indicated, this argument is without merit. The only interest compromised by the embargo was plaintiffs' expectation of ultimately selling their goods in the United States. Such an interest is not a protectable property interest under the Fifth Amendment. *See Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 217 (Fed. Cir.1993) (finding importer's expectation of ultimate market disposition of its product is "collateral interest," incident to importer's ownership of goods, and is not property interest protected under Fifth Amendment), *cert. denied,* —— U.S. ——, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994). Thus, the court rejects plaintiffs' claim under the Takings Clause of the Fifth Amendment.

### Conclusion

The court does not find that further exhaustion of administrative remedies is required prior to court resolution in this case. Further, the court holds that the AECA authorizes the imposition of the President's import embargo on defense articles from China. The actions taken by the administering agencies to effect the import embargo were similarly authorized and were not arbitrary, capricious or contrary to the stated objectives of the embargo. Finally, plaintiffs' constitutional claims are without merit. Plaintiffs' motion for summary judgment denied. Defendants' motion for summary judgment granted.

### JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

**IT IS HEREBY ORDERED:** that plaintiffs' motion for summary judgment is denied; defendants' motion for summary judgment is granted; and this action is hereby dismissed.

---

contending that this issue is more appropriately brought before the United States Claims Court. The court disagrees. Section 1581(i) of Title 28 provides that

the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

. . . .

(3) embargoes, or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety.

28 U.S.C. § 1581(i) (1988). In addition, 28 U.S.C. § 1367(a) states that district courts "shall

have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form a part of the same case or controversy." 28 U.S.C. § 1367(a) (Supp. II 1990). This provision extends to the Court of International Trade under 28 U.S.C. § 1585 (1988). *Associacao dos Industriais de Cordoaria e Redes v. United States,* —— CIT ——, —— n. 16, 828 F.Supp. 978, 988 n. 16 (1993). Either the takings claim arises out of an import embargo, which defendants dispute, or supplemental jurisdiction applies, as defendants concede. Given the intertwining of the issues, it would be a waste of judicial resources to transfer this claim to the Court of Federal Claims for disposition, even if primary jurisdiction lies in that court.