**FIELDSTON CLOTHES, INC., Plaintiff,**

v.

**The UNITED STATES, et al., Defendants.**

**Slip Op. 95–159.**
**Court No. 95–08–01043.**

United States Court of
International Trade.

Sept. 14, 1995.

Neville, Peterson & Williams (Margaret R. Polito and George Thompson), for plaintiff.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis), Arthur R. Watson, Senior Counsel, Alicia D. Greenidge, Attorney Advisor, Office of the Chief Counsel for International Commerce, United States Department of Commerce, of counsel, for defendants.

## OPINION

RESTANI, Judge:

This action is before the court on a motion for summary judgment made by plaintiff Fieldston Clothes, Inc. ("Fieldston") and on a motion to dismiss made by defendants United States, et al. Fieldston, an importer of Category 435 women's and girls' wool coats and blazers from Honduras ("Category 435 wool garments"), challenges an import quota placed upon such merchandise by the Committee for the Implementation of Textile Agreements ("CITA"). Fieldston requests a declaratory judgment and a permanent injunction prohibiting defendants from implementing the import restriction.

## BACKGROUND

Fundamentally, the Constitution grants plenary authority to Congress to regulate foreign commerce and trade with other nations. U.S. Const. art. I, § 8, cl. 3. Congress may delegate such authority to the Executive. *See, e.g., California Bankers* *Ass'n v. Shultz,* 416 U.S. 21, 59, 94 S.Ct. 1494, 1516, 39 L.Ed.2d 812 (1974). Section 204 of the Agricultural Act of 1956, 7 U.S.C. § 1854 (1988), authorizes the President to negotiate agreements with foreign governments limiting the exportation of textiles and textile products to the United States and to promulgate regulations to "carry out" such agreements. That provision, in pertinent part, provides:

> The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States of any ... textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such ... textiles, or textile products to carry out any such agreement. In addition, if a multilateral agreement has been or shall be concluded under the authority of this section among countries accounting for a significant part of world trade in the articles with respect to which the agreement was concluded, the President may also issue, in order to carry out such an agreement, regulations governing the entry or withdrawal from warehouse of the same articles which are the products of countries not parties to the agreement.

7 U.S.C. § 1854. The President's authority under this section, as it pertains to the implementation of textile trade agreements, was delegated to CITA, consisting of representatives of the Departments of State, the Treasury, Commerce, Labor, and the Office of the United States Trade Representative. Exec. Order No. 11,651, § 1(a), 3 C.F.R. 676 (1971–1975), *reprinted as amended in* 7 U.S.C. § 1854 note at 950 (1994). The Executive Order further provides that the United States Customs Service must take such actions as CITA recommends "to carry out all agreements and arrangements entered into by the United States pursuant to Section 204 of the Agricultural Act of 1956 ... with respect to entry, or withdrawal from warehouse, for consumption in the United States of textiles and textile products." Exec. Or-

der No. 11,651, § 2(a). The Arrangement Regarding International Trade in Textiles, Dec. 20, 1973, 25 U.S.T. 1002 pt. 1, commonly referred to as the "Multifiber Arrangement" or "MFA," was a textile trade agreement negotiated pursuant to Section 204.

Pursuant to the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809, 4815 (1994), the MFA expired on December 31, 1994, and was succeeded by the Uruguay Round Agreement on Textiles and Clothing ("ATC"). *See* Defs.' Exs. to Mem. in Supp. Mot. to Dismiss, Ex. 1 [hereinafter "ATC"]. The ATC was approved by Congress and entered into force under the Uruguay Round Agreements Act, effective January 1, 1995, pursuant to 19 U.S.C.A. § 3511(a)–(b), (d)(4) (West Supp.1995). *See Presidential Memorandum of December 23, 1994,* 60 Fed.Reg. 1003 (1995), *reprinted in* 19 U.S.C.A. § 3511 note at 423. The United States and Honduras are both signatories to the ATC. In conformity with the Uruguay Round Agreements Act, Congress amended the second sentence of Section 204, providing as follows:

> In addition, if a multilateral agreement, *including but not limited to the Agreement on Textiles and Clothing referred to in [19 U.S.C. § 3511(d)(4)]*, has been or is concluded under the authority of this section among countries accounting for a significant part of world trade in the articles with respect to which the agreement was concluded, the President may also issue, in order to carry out such agreement, regulations governing the entry or withdrawal from warehouse of the same articles which are the products of countries not parties to the agreement, *or countries to which the United States does not apply the agreement.*

Agricultural Act of 1956 § 204, *as amended in* 7 U.S.C. § 1854 (1994) (footnote omitted) (emphasis added) [hereinafter "Section 204"].

On April 24, 1995, the United States Government, through CITA, requested consulta-

tion with the Government of Honduras with regard to Category 435 wool garments produced or manufactured in Honduras. CITA published a notice on May 23, 1995, requesting public comments on the consultation. *Request for Public Comments on Bilateral Textile Consultations on Women's and Girls' Wool Coats,* 60 Fed.Reg. 27,275 (CITA 1995). In the notice, CITA stated that if no solution was agreed upon in consultations with the Government of Honduras, CITA may later establish a limit for Category 435 wool garments produced or manufactured in Honduras and exported to the United States, at a level not less than 14,400 dozen. *Id.*

In a letter dated June 2, 1995, Fieldston submitted comments to CITA. In these comments, Fieldston claimed that the Category 435 wool garments it had contracted for production in Honduras were constructed from fabric of U.S. origin and cut into garment components in the United States.[1] Fieldston further contended that the proposed quota limit was inconsistent with import statistics from similarly situated Central American countries. Finally, Fieldston argued that the proposed limit was inconsistent with the United States' obligations under the ATC.

On July 24, 1995, CITA published a notice that no agreement was reached during consultations with the Government of Honduras. *Establishment of an Import Limit for Certain Wool Products Produced or Manufactured in Honduras,* 60 Fed.Reg. 37,880 (CITA 1995). Accordingly, CITA decided to limit imports of the subject merchandise to 14,400 dozen for the period beginning on April 24, 1995, and extending through April 23, 1996. *Id.* As authority for this action, CITA cited Section 204, the Uruguay Round Agreements Act, the ATC, and Executive Order No. 11,651. *Id.* Currently, the matter is being considered by the Textiles Monitoring Body ("TMB"), which has not issued its recommendation on this matter.[2] In this

---

1. Plaintiff claims that it is the largest importer of Category 435 wool garments from Honduras, and that most of the garments counted against the quota at issue were imported by plaintiff. *See* Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. A at 1.

2. Under the ATC, the TMB, upon request by members failing to reach agreement on the restraint of exports, may examine the matter and issue recommendations as to the appropriate course of action to be taken by the members. ATC, art. 6, cl. 10, at 94.

action, Fieldston challenges CITA's authority to impose a unilateral import quota upon Category 435 wool garments.

## DISCUSSION

### I. Defendants' Motion to Dismiss for Lack of Jurisdiction and Standing

■ Defendants have filed a motion to dismiss Fieldston's action for lack of subject matter jurisdiction, for lack of standing, or alternatively, for failure to state a claim upon which relief may be granted. Defendants assert that subject matter jurisdiction is wanting on the grounds that Congress has precluded, under 19 U.S.C.A. § 3512(c)(1) (West Supp.1995), any private causes of action challenging the U.S. government's actions under the Uruguay Round Agreements Act. That section, in relevant part, provides:

No person other than the United States—

(A) shall have any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement, or

(B) may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, ... on the ground that such action or inaction is inconsistent with such agreement.

*Id.* Defendants correctly assert that Fieldston is precluded from challenging CITA's action as inconsistent with the Uruguay Round Agreements Act or the ATC. As it pertains to plaintiff's limited challenge in this case, however, defendants' jurisdictional argument is without merit.

■ Here, plaintiff's challenge is limited to whether CITA's imposition of the import quota is in accordance with the congressional delegation of authority to regulate trade in textiles and textile products under Section 204. As this court has noted, "[i]t is now well established ... that the exercise of broad discretionary authority delegated by Congress to the President in the sphere of international trade, where the President is acting essentially as an agent of Congress, is reviewable by the Courts only to determine whether the President's action falls within his delegated authority [and] whether the statutory language has been properly construed." *Florsheim Shoe Co. v. United States,* 6 CIT 1, 11, 570 F.Supp. 734, 743 (1983), *aff'd,* 744 F.2d 787 (Fed.Cir.1984). To the extent that CITA's action is beyond the scope of the President's delegated authority under Section 204, such action is *ultra vires* and void, and properly within the jurisdictional province of the court to declare. *See B–West Imports, Inc. v. United States,* 880 F.Supp. 853, 860 (Ct. Int'l Trade 1995).

■ Pursuant to 28 U.S.C. § 1581(i) (1988 & Supp. V 1993), the court possesses exclusive jurisdiction over cases involving embargoes or other quantitative restrictions such as the quota at issue.[3] CITA's action under Section 204, imposing the import restrictions at issue, falls squarely within the jurisdictional purview of 28 U.S.C. § 1581(i). *See also American Ass'n of Exporters and Importers–Textile and Apparel Group v. United States,* 751 F.2d 1239, 1244–46 (Fed.Cir.1985) (finding section 204 "a law providing for quantitative restrictions" within language of § 1581(i)) ("*AAEI–TAG*").

■ Defendants also assert that no final agency action has issued in this case, *see supra* note 2, and, thus, Fieldston has not exhausted its administrative remedies.[4] Assuming, *arguendo,* that action of an international body is the type of agency action to which the exhaustion doctrine applies, the court finds that there is no need to await

---

**3.** Pursuant to 28 U.S.C. § 1581(i)(3), (4), the court shall have exclusive jurisdiction of any civil action commenced against the United States ... that arises out of any law of the United States providing for—

. . . .

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

*Id.*

**4.** *See* 28 U.S.C. § 2637(d) (1988) ("The [CIT] shall, where appropriate, require the exhaustion of administrative remedies.").

further action by either the TMB or CITA. Whether the import restriction placed upon plaintiff's merchandise by CITA is *ultra vires* is ripe for judicial review. *Cf. AAEI–TAG,* 751 F.2d at 1245–46 (noting that exhaustion not required under protest procedures where prospective importers challenge Customs regulations imposing import restrictions). Furthermore, when or whether this matter may be resolved through further negotiations or by the TMB is not clear. *See supra* note 2. As the quota category is nearly full, delay would be prejudicial. *See B–West Imports,* 880 F.Supp. at 858–59 (rejecting exhaustion requirement where time frame for agency deliberations of plaintiffs' applications for relief from import restrictions uncertain and exhaustion requirement would be prejudicial).

■ As to plaintiff's standing, Congress has provided that any civil action of which this court has jurisdiction may be commenced by "any person adversely affected or aggrieved by agency action within the meaning of [5 U.S.C. § 702]."[5] 28 U.S.C. § 2631(i) (1988). Plaintiff is a party adversely affected by CITA's import restrictions as prospective Category 435 wool garment imports by Fieldston are now unable to enter the United States. Thus, the court finds that Fieldston has standing to contest whether the quota at issue is properly within the scope of the delegation of authority set forth in Section 204.

II. Plaintiff's Motion for Summary Judgment

■ Fieldston raises three main arguments in support of its contention that CITA is without statutory authority under Section 204 to impose a unilateral quota upon Category 435 wool garments from Honduras. First, Fieldston asserts that, under the first sentence of Section 204, the President's authority to negotiate and regulate agreements limiting exports is confined to bilateral agreements reached between the United States and a foreign government. In the absence of a bilateral agreement,[6] Fieldston reasons, an import quota may not be imposed under the first sentence of Section 204. Additionally, where a multilateral agreement, such as the ATC, is involved under the second sentence of Section 204, Fieldston contends an import quota may only be imposed (1) where the exporting country is not a member of the ATC, or (2) where the United States does not apply the ATC to the exporting country. Thus, Fieldston insists, CITA may not unilaterally impose an import quota in this case. The court disagrees.

The first sentence to Section 204 does not support the narrow construction propounded by Fieldston. Congress granted the President broad authority to "negotiate with ... foreign governments in an effort to obtain agreements limiting the export from such countries" of textiles and textile products into the United States. 7 U.S.C. § 1854. No language in the first sentence of Section 204 restricts the President's delegated authority to the negotiation and regulation of bilateral agreements with individual foreign governments. Rather, the sentence refers to "agreements" generally, whether they be bilateral or multilateral. Any doubt is resolved by the second sentence of Section 204, which reads in part: "In addition, if a multilateral agreement ... has been or is concluded *under the authority of this section....*" *Id.* (emphasis added). Thus, Congress intended that the President may negotiate and enforce multilateral, as well as bilateral agreements, under the first sentence to Section 204.

Contrary to Fieldston's contention, this reading of the statute does not render the modifier, "multilateral," superfluous in the second sentence of Section 204. As defendants indicate, and Fieldston notes, the principal purpose of the second sentence of Section 204 was to eliminate the possibility that countries which were not members of the

---

**5.** Section 702 of Title 5, United States Code, provides in part that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1994).

**6.** Presently, no bilateral agreement exists between the United States and Honduras.

World Trade Organization ("WTO")[7], or WTO members to whom the United States did not extend the benefits of the ATC, from unjustly benefitting from the specific limits on textile products to which WTO members had already agreed. Defs.' Mem. in Opp'n to Pl.'s Mot.Summ.J. at 11 n. 8; Pl.'s Mot. Summ.J. at 14–15 & n. 8. The court finds Section 204 sufficiently clear as not to warrant analysis under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (describing standard to be applied in reviewing agency's construction of statute that is silent or ambiguous with respect to certain issues), assuming, *arguendo*, that the principles of *Chevron* apply to this case.[8]

■ Second, Fieldston argues the ATC is not an "agreement" within the meaning of the first sentence of Section 204 as the ATC is not an "agreement[ ] limiting the export ... [of] textiles or textile products." *See* 7 U.S.C. § 1854. Specifically, Fieldston contends the ATC is only a framework for negotiating agreements, envisioning the amendment and dismantling of existing quota agreements. While dismantling of quotas is clearly an ATC goal, the court disagrees with plaintiff's narrow characterization of the ATC.

Article 6 of the ATC sets forth a "transitional safeguard mechanism" under which exports may be restricted in the absence of mutual agreement between or among member countries. ATC, art. 6, at 92. Clause 8 of Article 6, for example, provides that "the level of such restraint shall be fixed at a level not lower than the actual level of exports or imports from the Member concerned during the 12–month period terminating two months preceding the month in which the request for consultation was made." *Id.*, art. 6, cl. 8, at 93. The restraint upon exportations may be maintained for up to three years without extension, or until the product is integrated into the 1994 General Agreement on Tariffs and Trade, whichever comes first. *Id.*, art. 6, cl. 12, at 94. Furthermore, the ATC permits the noticing and preservation by member countries of quantitative restrictions, within bilateral agreements or under the MFA, in effect prior to the entry into force of the WTO agreement. *Id.*, art. 2, cl. 1, at 86. Based on the foregoing, the court concludes that the ATC qualifies as an agreement limiting the export of textiles and textile products within the meaning of Section 204.

■ Finally, Fieldston contends the ATC was not specifically negotiated pursuant to the President's delegated authority to negotiate and regulate textile agreements under Section 204. Although Fieldston correctly asserts that the ATC was negotiated pursuant to the Omnibus Trade and Competitiveness Act of 1988 § 1102, 19 U.S.C. § 2902 (1988 & Supp. V 1993), the court finds the ATC was also negotiated pursuant to Section 204. As previously noted, Congress amended Section 204 to include the ATC as a "multilateral agreement ... concluded under the authority of [Section 204]." 7 U.S.C. § 1854. This evidences clear congressional intent to incorporate agreements such as the ATC within the President's broad authority to negotiate and regulate textile trade agreements under Section 204. *See Florsheim Shoe Co.*, 744 F.2d at 793 (noting that in the context of international trade, "congressional authorizations of presidential power should be given a broad construction"). This conclusion is further supported by the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, and approved by Congress.[9] The "[Uruguay Round Agreements Act] clarifies that the [ATC] constitutes a multilateral agreement for purposes of [S]ection 204." Statement of Administrative Action, H.R.Doc. No. 316, at

---

7. The World Trade Organization was established by the Uruguay Round. *See* Statement of Administrative Action, H.R.Doc. 316, vol. 1, 103d Congress, 2d Sess. 659–61 (1994) (summarizing establishment of WTO and its functions and structure).

8. Plaintiff disputes the applicability of *Chevron*. *See* Pl.'s Mot.Summ.J. at 18–19.

9. The Statement of Administrative Action was approved by Congress as an "authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements ... in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C.A. § 3512(d) (West Supp.1995).

768. Finally, as indicated, at the outset of the transition period, quota restrictions imposed under prior bilateral agreements or the MFA and admittedly negotiated under Section 204, are maintained under the provisions of the ATC.

■ The remaining question addressed by the court is whether the ATC satisfies the test set forth in *AAEI–TAG* for determining whether the challenged action is *ultra vires* and beyond the delegated authority of Section 204. That is, whether the imposition of the import quota by CITA is "relevant to the enforcement of some existing textile agreement." 751 F.2d at 1247. As the ATC is an agreement limiting the export of textiles and textiles products within the meaning of Section 204, and CITA avows that the unilateral quota is imposed pursuant to rights granted by the ATC and in lieu of negotiated quotas under the ATC, the court finds CITA's action to pertain to the general subject matter of the ATC and consequently to be relevant to its enforcement.[10]

## CONCLUSION

The court rejects defendants' jurisdictional challenges to Fieldston's action. CITA's imposition of the import quota upon Category 435 wool garments from Honduras is sustained as it does not exceed the broad authority granted by Congress under Section 204. Judgment herein has issued.

---

10. The court does not address Fieldston's objections to the procedural implementation of the ATC by CITA. As noted, all that is needed is that CITA's actions be relevant to the enforcement of the ATC. Further, as indicated, Congress has precluded private parties from raising such challenges before the court. *See* 19 U.S.C.A. § 3512(c)(1).